20-2559
*In re Demetriades*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued:   December 12, 2022
Decided:   January 18, 2023

No. 20-2559

IN RE:   TARA A. DEMETRIADES,

*an Attorney and Counselor-at-Law.**

Appeal from the Committee on Grievances of the Board of Judges
of the United States District Court for the Eastern District of New York
No. 17-mc-300, Ann M. Donnelly, *Judge*.

Before:        SACK, SULLIVAN, and PARK, *Circuit Judges*.

Tara A. Demetriades appeals from orders of the Committee on Grievances of the Board of Judges of the United States District Court for the Eastern District of New York (the "Committee") finding her liable for violating various provisions of the New York Rules of Professional Conduct and imposing sanctions for these violations, including a six-month suspension from practicing law in the Eastern District.   On appeal, Demetriades argues that the Committee (1) deprived her of due process by failing to afford her with reasonable notice of the charges and an adequate opportunity to defend against the charges, (2) failed to substantiate each element of the charges by clear and convincing evidence, and (3) imposed a punishment that was excessive in light of the putative lack of harm to the public.

---

*  The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

She has also requested that we maintain her appeal under seal, arguing that public disclosure of her identity would cause her reputational harm.   For the reasons explained below, we reject each of these arguments.   As a result, we **AFFIRM** the orders of the Committee and **ORDER** that the docket in this appeal, and all its contents, be unsealed.

   AFFIRMED.

> RANDALL W. JACKSON, Willkie Farr & Gallagher LLP, New York, NY, *for Amicus-Appellee Committee on Grievances.*
>
> DERRICK STORMS, Solomos & Storms, PLLC, Astoria, NY, *for Respondent-Appellant Tara A. Demetriades.*

RICHARD J. SULLIVAN, *Circuit Judge*:

   Tara A. Demetriades appeals from orders of the Committee on Grievances of the Board of Judges of the United States District Court for the Eastern District of New York (the "Committee") finding her liable for violating various provisions of the New York Rules of Professional Conduct and imposing sanctions for these violations, including a six-month suspension from practicing law in the Eastern District.   On appeal, Demetriades argues that the Committee (1) deprived her of due process by "failing to afford her with reasonable notice of the charges and an adequate opportunity to defend against the charges," (2) "failed to substantiate each and every element of the charges by clear and convincing evidence," and

2

(3) imposed a "punishment [that] was excessive in light of the fact there was no harm to the public." Demetriades Br. at 1. She has also requested that we maintain her appeal under seal, arguing that public disclosure of her identity would cause her reputational harm. For the reasons explained below, we reject each of these arguments. Accordingly, we affirm the orders of the Committee and order that the docket in this appeal, and all its contents, be unsealed.

## I. BACKGROUND

### A. Facts

Demetriades is a solo practitioner whose firm, ADA Accessibility Associates, focuses primarily on litigation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA") – specifically, under its provisions requiring places of public accommodation to take readily achievable steps to make their premises and facilities accessible to individuals with disabilities, *see id.* §§ 12181–12183. As relevant here, she is admitted to practice in New York and in the U.S. District Court for the Eastern District of New York (the "Eastern District").

After receiving a J.D. from Brooklyn Law School in 1999, Demetriades spent roughly ten years working as an associate in the general commercial litigation, tobacco law, and general torts practices of various national and regional law firms

in Florida and Georgia. In 2000, the Florida bar suspended her from the practice of law for ninety days after she was arrested in a criminal matter. In 2009, she opened a small practice of her own in Florida, focusing on immigration law.

In 2013, Demetriades decided to transition the focus of her practice to disability law after meeting Cemal Jay Egilmez, a self-described "ADA inspector," at a charity poker tournament.[1] Although she had no prior experience working on ADA cases, Demetriades wanted "to increase [her] income" and thought that ADA litigation "sounded like something that might provide [her] with an opportunity to generate additional legal work and revenue." App'x at 857. She also saw it as "something that was sort of feel-good work with clients that [sic] were very appreciative." *Id.* at 516. Shortly after meeting, Demetriades and Egilmez began working together, with Egilmez introducing Demetriades to potential plaintiffs for ADA lawsuits and conducting "undercover" investigations of small businesses and documenting ostensible ADA violations on their premises. *Id.* at 561.

---

[1] As Egilmez has acknowledged in these proceedings, he is "not certified" to "be an ADA inspector," and there is "no such thing as a federal certification of an ADA inspector." App'x at 418.

4

Around the same time, Demetriades also "decided to transition [her] practice [from Florida] to New York" and was admitted to practice in the Eastern District in 2014. *Id.* at 513. Over the next three years, she filed approximately 168 ADA cases against small businesses in the Eastern District, each on behalf of one of the same eight plaintiffs.

Before commencing these actions, Demetriades would not "examin[e] the propert[ies]" of potential defendants "[her]self" – which she deemed "[ir]relevant" because she is "not an expert or an architect" and is largely "ignorant" of the "technical" requirements of the ADA – and instead relied on "violations list[s]" or "inspection reports" provided by Egilmez for a fee. *Id.* at 569, 673, 880. In preparing such reports, Egilmez – acting on Demetriades's instruction "not to communicate with anybody . . . because they could be represented by counsel," *id.* at 561 – would "not inquire as to any accommodations that may not be readily visible, such as a portable ramp, or assistance that might be available upon request," Sp. App'x at 7. Likewise, his reports would omit "things . . . that [he and Demetriades] d[id]n't necessarily want to disclose to defendant's counsel." App'x at 555. As a result, many of the reports that Egilmez prepared for Demetriades contained factual inaccuracies and

unsubstantiated legal theories of ADA violations.   Demetriades did not "know

the procedure by which [Egilmez] conduct[ed] his inspections" and had "never

been with him on an inspection."   *Id.* at 862.

On the client-facing side of her business model, Demetriades's standard

"retainer agreement" provided that her "client[s] waive[d] the right to pursue

monetary damages," "agree[ed] to seek only injunctive relief," and agreed that

"any and all money . . . that's awarded to the plaintiff as a result of the lawsuit

goes to [Demetriades]."   *Id.* at 632–33.   (She was not "aware that under New York

law, disabled people denied access to properties can recover[] compensatory

damages."   Sp. App'x at 8.)   Demetriades "built [her] business [as] a mass" or

"volume practice," and of the roughly 168 ADA cases that she filed in the Eastern

District, she took none to trial and pursued none to a favorable judgment on the

merits.   App'x at 619.

As a result of this "mass" or "volume" approach to her practice – evidently

compounded by "personal issue[s]" that arose "during [a] period of time when

[her] dog was sick" – Demetriades found herself "way over-burdened in terms of

[her] case load."   *Id.*   And as a result of her unmanageable caseload, Demetriades

"repeatedly" "allowed [her clients'] case[s] to languish," "face[d] dismissal [of

those cases] for failure to prosecute," "failed . . . to abide by [c]ourt-ordered deadlines," and "failed to appear at . . . hearings" and "[c]ourt conferences," for which she was sanctioned and/or reprimanded by several different judges of the Eastern District.   Sp. App'x at 9–10.

Hoping to "get some additional assistance" with her "over-burdened" caseload while she "deal[t] with [her] animal," Demetriades decided to "look[] for somebody to cover all of [her] New York cases . . . for [a] few months."   App'x at 609, 611, 619.   To that end, she made an "arrangement" for a lawyer named W. Marilyn Pierre "to attend [Demetriades's] hearing[s] and for [Demetriades] to pay [Pierre] for attending the hearing[s]" on a flat-fee, per-hearing basis.   *Id.* at 611.

At a November 2016 settlement conference (to which she had arrived forty-five minutes late, citing the fact that she had "a very sick [dog] at home"), Demetriades was questioned by a magistrate judge about her "pattern in the Eastern District" of being "unable to comply with [her] obligations in [her] cases"; Demetriades responded by assuring the magistrate judge that she "ha[d] Marilyn Pierre[] working with [her] . . . out of [her] Long Island office" as "an associate." *Id.* at 779–81.   When specifically asked to clarify whether Pierre was in fact a "contract attorney[]," Demetriades doubled down, stating, "No, she is an associate

attorney with my firm.   Marilyn Pierre is her name and she was just hired by us

about two weeks ago." *Id.* at 781–82.   Demetriades would later admit that Pierre

actually *was* "a contract attorney," that she understood that a contract attorney is

"a separate animal" from an associate, that she had "never hired [Pierre] as [her]

employee," and that Pierre did not "actually work at" her "Long Island office."

*Id.* at 613, 734, 783, 854.

Just a month later, Demetriades was ordered to attend a show-cause hearing

to address her repeated failures to comply with court deadlines, orders, and rules

in another one of her Eastern District cases.   Despite the court's issuance of two

separate orders expressly stating that Demetriades, as "counsel of record," was

required to appear personally and that her last-minute filing of a stipulation of

dismissal did not "excuse [her] appearance[]," Demetriades declined to appear

and instead sent Pierre on her behalf.   Sp. App'x at 18 (first quoting E.D.N.Y. Dkt.

No. 16-cv-982 (NG), Doc No. 15 at 1; then quoting E.D.N.Y. Dkt. No. 16-cv-982

(NG), Minute Order of Dec. 20, 2016).   When the magistrate judge reached her via

speakerphone in open court, Demetriades spent several minutes insisting that she

did not "need to participate."   App'x at 79.   She then started "shouting," Sp.

App'x at 19, at the magistrate judge:

8

> I am on vacation at the moment . . . . I mean I can't always be available every single second of every single day . . . . I don't even know exactly what the [c]ourt is looking for from me. . . . I'm not understanding exactly what we're doing or what the [c]ourt's goal is here. . . . I'm not sure why it is the [c]ourt consistently forgets that there are actually clients here.   Every one of my clients that I brought to the [c]ourt pursuant to [c]ourt orders, they've been treated in a very nasty way. They've gotten nothing but disdain from the [c]ourt and anger. . . . [T]hey've literally been badgered by the [c]ourt.

App'x at 90–92.   As to the merits of the district court's show-cause order, Demetriades refused to accept responsibility for her failures to comply with prior court orders, instead asserting that they were "obviously [the] fault of the [court-ordered mediation] program."   *Id.* at 84.   Demetriades would later concede that her conduct during this hearing was "awful" and "terrible."   *Id.* at 583.

## B.  Procedural History

As a result of Demetriades's above-described conduct and violations of court orders, the district court (Mann, *Mag. J.*) made a referral to the Committee in February of 2017.   The Committee (Cogan, *J.*) then appointed outside counsel from the law firms of Boies, Schiller & Flexner LLP and Willkie Farr & Gallagher LLP (the "Outside Counsel") to investigate Demetriades's potential violations of the New York Rules of Professional Conduct and, if appropriate, to prosecute charges for such violations.   Following the conclusion of Outside Counsel's six-

month investigation, the Committee charged Demetriades with violating Rules 1.1, 1.3, 3.2, 3.3, 3.4, 5.3, 5.5, and 8.4(d) – which concern competence, diligence, delay of litigation, false statements and conduct before a tribunal, fairness to opposing parties and counsel, lawyers' responsibility for the conduct of nonlawyers, unauthorized practice of law, and general misconduct, respectively – and ordered her to show cause as to why she should not be subject to discipline.

In September 2017, the Committee referred the matter to Magistrate Judge Kuo to adjudicate any necessary hearing and argument, to render a Report and Recommendation on whether the charges should be sustained, and to recommend any appropriate sanction. In the lead-up to the evidentiary hearing on Demetriades's liability, the Outside Counsel prosecuting the charges provided extensive discovery to Demetriades and her counsel. Pursuant to instructions from Magistrate Judge Kuo, the parties also exchanged witness and exhibit lists and submitted pre-hearing memoranda laying out their respective views on the applicable law underlying each of the counts in the Committee's Statement of Charges.

Following a three-day evidentiary hearing and several rounds of post-hearing briefing, Magistrate Judge Kuo recommended that the Committee find Demetriades liable for violating Rules 1.1(a), 1.3(a) and (b), 3.2, 3.3(a) and (f)(2)–(3), and 3.4(c), but *not* liable for violating Rules 5.3, 5.5(a), or 8.4(d). Over objections from Demetriades, the Committee (Donnelly, *J.*) adopted Magistrate Judge Kuo's liability-phase Report and Recommendation in its entirety.

At the sanctions phase, the parties waived an additional evidentiary hearing and made only written submissions. After reviewing their submissions, Magistrate Judge Kuo recommended that Demetriades be suspended from practicing law in the Eastern District for a period of three to six months, and that she be required to obtain professional counseling for stress management. Demetriades objected to the recommendation as to suspension, arguing that she should instead only be reprimanded, but made no objection to the recommendation as to stress-management counseling. The Committee adopted Magistrate Judge Kuo's sanctions-phase Report and Recommendation in its entirety and imposed a six-month suspension as well as mandatory stress-management counseling.

Demetriades timely appealed.

11

## II.   STANDARD OF REVIEW

We review the Committee's disciplinary order for abuse of discretion, while reviewing de novo whether the conduct in question was within the scope of the disciplinary rules in question.   *In re Peters*, 642 F.3d 381, 384 (2d Cir. 2011).   The Committee "has abused its discretion if its imposition of sanctions was based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or cannot be located within the range of permissible decisions."   *Id.* (internal quotation marks omitted).[2]

## III.   DISCUSSION

### A. Unsealing

As an initial matter, we must address the sealing status of this appeal. Although the parties submitted their briefs and appendix under seal, we deem it

---

[2] We have previously noted that "when the district court is accuser, fact finder[,] and sentencing judge all in one," our review is "more exacting than under the ordinary abuse-of-discretion standard." *Peters*, 642 F.3d at 384 (citation omitted).   But we reject Demetriades's contention that this "heightened abuse-of-discretion standard" applies in her case.   Demetriades Br. at 12. Here, Magistrate Judge Mann made the initial referral to the Committee, Judge Cogan filed the Committee's Statement of Charges against Demetriades, two lawyers from outside firms were appointed to investigate and prosecute the charges on behalf of the Committee, Magistrate Judge Kuo conducted the evidentiary hearing on Demetriades's liability, and Judge Donnelly signed the Committee's final orders finding Demetriades liable and imposing sanctions.   Since four different judges served as "accuser, fact finder[,] and sentencing judge" in the disciplinary proceedings below, it is appropriate for us to apply the "ordinary abuse-of-discretion standard" in this appeal.   *Peters*, 642 F.3d at 384 (citation omitted).

appropriate to issue this Opinion on the public docket and for publication in the Federal Reporter.   Likewise, while this appeal was originally docketed under the caption "*In re:  Jane Doe*," we deem it appropriate to refer to Demetriades by her real name in this Opinion.

This Court has consistently recognized a "strong presumption . . . under both the common law and the First Amendment" that judicial documents – and especially judicial *decisions*, which "are used to determine litigants' substantive legal rights" – "should . . . be subject to public scrutiny."   *Lugosch v. Pyramid Co.*, 435 F.3d 110, 121 (2d Cir. 2006) (citation omitted); *see also United States v. Amodeo*, 71 F.3d 1044, 1048–50 (2d Cir. 1995); *United States v. Amodeo*, 44 F.3d 141, 145–46 (2d Cir. 1995); *United States v. Biaggi (In re N.Y. Times Co.)*, 828 F.2d 110, 116 (2d Cir. 1987); *Joy v. North*, 692 F.2d 880, 893–94 (2d Cir. 1982); *United States v. Myers (In re Nat'l Broad. Co.)*, 635 F.2d 945, 949–54 (2d Cir. 1980).   That presumption, of course, "does not end the inquiry," *Lugosch*, 435 F.3d at 120, and judicial documents "may be sealed" if sealing "is essential . . . and . . . narrowly tailored" to "preserve higher values" or "interest[s]," *In re N.Y. Times Co.*, 828 F.2d at 116 (quoting *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 9 (1986)) – for example, to "safeguard[] the physical and psychological well-being" of "minor victims of sex crimes," *Globe Newspaper*

*Co. v. Super. Ct.*, 457 U.S. 596, 607–08 (1982), or to avoid "providing terrorist elements with propaganda to fuel their continued global hostilies against the United States," *Dhiab v. Trump*, 852 F.3d 1087, 1097 (D.C. Cir. 2017).

Here, the only "interest" in sealing that Demetriades puts forth is her personal interest in avoiding the "reputational harm" that she might suffer if the public were made aware of the "very serious allegations here." Oral Argument at 1:38–1:53, https://www.ca2.uscourts.gov/decisions/isysquery/33cdd5af-c9dc-4399-88d1-03746697343f/12/doc/20-2559.mp3. That interest, however, cannot meet the "weighty" standard for overriding the presumptions of open records and public access. *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 304 (2d Cir. 2012) (quoting *Globe Newspaper Co.*, 457 U.S. at 606); *see, e.g.*, *Lugosch*, 435 F.3d at 116 (vacating district-court sealing order premised on possibility that "presumption of access" might be outweighed by "defendants' . . . interests in unwarranted reputational injury" if defendants ultimately won favorable merits judgment (internal quotation marks omitted)); *SEC v. TheStreet.Com*, 273 F.3d 222, 234 (2d Cir. 2001) (affirming district court's grant of third-party motion to unseal over party's objection that "possible reputational harm" justified continued sealing). Indeed, we see no meaningful public "value[]" that would be served by

filing this Opinion under seal – or by using a pseudonym to refer to Demetriades. *Press-Enter. Co.*, 478 U.S. at 9 (citation omitted). To the contrary, we have repeatedly found public censure or reprimand to be an appropriate and valuable "corrective measure" in attorney-misconduct cases, "in order to protect the public, other attorneys and litigants, the Court, and the administration of justice." *In re Jaffe*, 585 F.3d 118, 121 (2d Cir. 2009); *see also, e.g., In re Agola*, 484 F. App'x 594, 598 (2d Cir. 2012); *In re Einhorn*, 428 F. App'x 26, 27 (2d Cir. 2011).

For essentially the same reasons, we see nothing to justify the continued sealing of the docket in this appeal, or of any of the documents filed on the docket. We must also unseal the contents of the docket for a more quotidian reason: under our Circuit's Local Rules, a "document" may be "sealed" only if it was either "placed under seal by order of a district court," or "placed under seal . . . by order of this [C]ourt *upon the filing of a motion*." 2d Cir. Loc. R. 25.1(a)(1)(E) (emphasis added).

Here, neither party ever made a formal, written motion for leave to file its appellate briefs, substantive motions, or other submissions under seal. Instead, the parties appear to have simply assumed that, because the district-court docket was sealed in its entirety, they could continue filing under seal in *this* Court

15

without first obtaining leave to do so. That is incorrect. The case-filing instructions on our Court's public website make clear that under Local Rule 25.1, "[a] document that was not sealed in the district court will not be sealed in the Court of Appeals without a Court order"; "[a] party wishing to file a paper under seal with the Court of Appeals must make a written motion"; and "[a]n informal request to seal a document will not be entertained." U.S. Ct. of Appeals for the 2d Cir., *How to Appeal a Civil Case to the United States Court of Appeals for the Second Circuit* 12 (2017), *available at* https://www.ca2.uscourts.gov/clerk/case_filing/appealing_a_case/pdf/How_to_Appeal_a_Civil_Case_rev_07-17.pdf.

As for the documents that were "sealed in the district court" and "received as part of the record," such documents generally "will remain under seal in the Court of Appeals" by operation of Local Rule 25.1. *Id.* Here, however, the Eastern District has unsealed the docket in the underlying disciplinary proceeding in the time since Demetriades appealed. It is difficult to imagine any "value[]" that would be served by maintaining under seal a district-court record that has already been unsealed in the district court, let alone a "higher value[]" that might

suffice to overcome the presumption of open records. *Press-Enter. Co.*, 478 U.S. at 9 (citation omitted).

Finally, we memorialize here our decision not to seal the courtroom for oral argument in this appeal. *See* Oral Argument at 0:07–3:16 (colloquy on this issue). The First Amendment affords the public a qualified right of access to a wide array of judicial proceedings in both criminal and civil matters. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–77 (1980) (plurality op.) (criminal trials); *Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 505–10 (1984) (criminal voir dire proceedings); *Press-Enter. Co.*, 478 U.S. at 13–15 (preliminary criminal hearings); *N.Y. C.L. Union*, 684 F.3d at 298 ("civil trials and . . . their related proceedings and records," as well as "non-trial civil proceedings" and "administrative adjudication[s]"). Thus, as we have explained in the context of reprimanding a district court for sealing *its* courtroom, "the power to close a courtroom where proceedings are being conducted . . . is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons." *United States v. Alcantara*, 396 F.3d 189, 192 (2d Cir. 2005) (citation and alteration omitted). We see no reason to hold ourselves to a lower standard of "protect[ing] the public against the government's 'arbitrary

17

interference with access to important information.'" *N.Y. C.L. Union*, 684 F.3d at 298 (quoting *Richmond Newspapers*, 448 U.S. at 583 (Stevens, *J.*, concurring)). Indeed, as one of our sister circuits has explained, "[t]here can be no question that the First Amendment guarantees a right of access by the public to oral arguments in the appellate proceedings of this [C]ourt." *United States v. Moussaoui*, 65 F. App'x 881, 890 (4th Cir. 2003).

Of course, much as the "First Amendment right of access to certain judicial documents" is "qualified," *Lugosch*, 435 F.3d at 120, so too is the "right of access" to certain judicial "proceedings," *N.Y. C.L. Union*, 684 F.3d at 303–04. That right may be overcome only by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. Co.*, 464 U.S. at 510. But here, as explained above, we see no such overriding interest. To the contrary, the higher values at stake here all point in *favor* of open public access to our proceedings in, and disposition of, this appeal.

## B. Due Process

We now turn to the merits. Demetriades first argues that the Committee "improperly expanded the charges at [the evidentiary hearing], thereby depriving

18

[her] of due process of law." Demetriades Br. at 12 (capitalization standardized).

More specifically, Demetriades contends that the Committee "did not provide [her] with reasonable notice" of the "false statement charge" related to her falsely "referring to her work companion as an 'associate' during questioning by the [district] [c]ourt," for which she was ultimately found liable under Rule 3.3(a). *Id.* at 2, 13, 16. We disagree.

The Committee's Statement of Charges explicitly charged Demetriades with a "Count" under "New York State Rule of Professional Conduct 3.3" for having "misrepresented the composition of her law firm to the [district] [c]ourt." App'x at 103–04. Even more "[s]pecifically," the charging document explained that this count was based on the Committee's allegation that, in a 2016 case before Judge Glasser and Magistrate Judge Mann, "Demetriades [had] stated that W. Marilynn Pierre was employed as an associate at her firm working out of the Long Island office," when "[i]n fact, . . . Ms. Pierre . . . had never been an employee of [Demetriades's] firm and ha[d] never even visited the Long Island office." *Id.* at 104.

Nevertheless, Demetriades argues that the Statement of Charges did not provide reasonable notice because it included an appendix "set[ting] forth the

19

[fifty-one] specific cases" in which "[her] misconduct" had allegedly occurred, *id.* at 103, and Outside Counsel were allowed at the evidentiary hearing to introduce "evidence" that she had *also* made the same misrepresentation concerning Pierre "in [another] case" that was "not within the [fifty-one]" listed in the appendix to the Statement of Charges, *id.* at 221.   That argument fails for several independent reasons.

For starters, we find that there was no meaningful variance, much less a fatal one, between the Statement of Charges and the evidence introduced by Outside Counsel at the evidentiary hearing.   In cases on the constructive amendment of indictments in criminal prosecutions, we have repeatedly recognized that "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment," *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983), and we have thus "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial," *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphasis in original; footnote and citation omitted).   *See, e.g.*, *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (finding no constructive amendment of indictment where government offered evidence of a different facility of interstate commerce than that referenced

in indictment); *United States v. Dupre*, 462 F.3d 131, 141–43 (2d Cir. 2006) (finding

neither constructive amendment nor prejudicial variance where government

offered evidence of different wire transfer than wire referenced in indictment).

Since "an attorney subject to a . . . disciplinary proceeding" is entitled to narrower

due-process protections than "the full panoply of federal constitutional

protections that apply to a criminal prosecution," *In re Jacobs*, 44 F.3d 84, 89 (2d

Cir. 1994), it follows a fortiori that as long as Demetriades received notice of "the

*core of [attorney misconduct]* to be proven," *Rigas*, 490 F.3d at 228 (emphasis in

original; footnote and citation omitted), she cannot complain that the Committee's

"proof at [the evidentiary hearing]" was not "a precise replica of the charges

contained in [the Statement of Charges]," *Heimann*, 705 F.2d at 666.   And here, the

charging document's detailed explanation of Demetriades's alleged

"misrepresent[ations] . . . to the [district] [c]ourt" regarding Ms. Pierre's role (or

lack of formal role) in her firm, App'x at 103–04, constituted more-than-adequate

"notice" of the "core" of the Rule 3.3(a) false-statement charge that was ultimately

"proven" by the Committee at her evidentiary hearing, *Rigas*, 490 F.3d at 228

(emphasis and citation omitted).

Moreover, "an attorney may receive adequate notice of a misconduct charge

by means other than [the formal charging document] served prior to the sanctions hearing." *Peters*, 642 F.3d at 386–87. Here, Outside Counsel "provided [Demetriades], in advance of th[e] [evidentiary] hearing, . . . with specific recordings" of her alleged misrepresentation in the case not among the fifty-one listed in the appendix to the Statement of Charges, along with a written "testimonial stipulation" from the Magistrate Judge in that case (also "in advance of the hearing"). App'x at 228. Thus, we agree with the Committee that "[t]he Statement of Charges," taken "*together with* . . . the documents produced in discovery, and Committee counsel's [other] pre-hearing [submissions,] gave [Demetriades] fair notice of the charges against her." Sp. App'x at 58 (emphasis added).

Finally, Demetriades cannot prevail on her claim of a fatal "variance between [the Statement of Charges] and the proof at [the evidentiary hearing]" unless she can "prove prejudice." *Dupre*, 462 F.3d at 140. In her appellate briefs here, Demetriades identifies no prejudice that resulted from the putative variance. Nor could she. That is because "[w]e decide whether a variance . . . is prejudicial" principally "by determining whether" it is "of a character . . . such as to deprive the accused of [her] right to be protected against another [future charge] for the

22

same offense." *Id.* at 140, 142 (citation omitted). As a result, there can be "no potential for prejudice in [a] case where [multiple] acts of [a given offense] were proven at trial, whereas the [charging document] only [detailed] one [such] act." *Id.* at 142 (internal quotation marks and alteration omitted). That is precisely what happened here: the Statement of Charges detailed one instance of Demetriades making false statements to the judges of the Eastern District about Ms. Pierre's status as an associate in her law firm, and at Demetriades's evidentiary hearing, the Committee ended up putting on proof that she had actually made even *more* false statements to the same effect. Under these circumstances, there was "no potential for prejudice." *Id.* (citation and alteration omitted).

Despite all this, Demetriades argues that even if the Statement of Charges provided adequate notice of Outside Counsel's intention to prosecute a false-statement charge at the evidentiary hearing, such notice was effectively negated by Outside Counsel's pre-hearing memorandum, which Demetriades characterizes as "narrow[ing] the charges" and falsely assuring her that Outside Counsel's case at the hearing would not "include a false[-]statement charge." Demetriades Br. at 4, 6, 13. This argument is contradicted by the record and no more persuasive than Demetriades's other due-process arguments.

To begin with, Magistrate Judge Kuo's instructions for the parties' pre-hearing memoranda indicated that they were to "educate [her] on the law" by "narrow[ing] the [legal] *issues*" at play, App'x at 160, 164 (emphasis added) – not to "narrow the *charges*" or the factual predicates therefor, Demetriades Br. at 13 (emphasis added). And in any event, nothing in Outside Counsel's pre-hearing memorandum indicated an intention to drop the false-statement charge noticed in the Committee's initial Statement of Charges. Quite the contrary. Outside Counsel's pre-hearing memorandum gave explicit notice that "the factual basis for the charge that Ms. Demetriades violated Rule 3.3" was "outline[d]" in "[p]aragraphs 8-11 [of the Statement of Charges]," App'x at 182 – which includes the paragraph alleging that "Demetriades misrepresented the composition of her law firm to the [Eastern District]" when she "stated that W. Marilynn Pierre was employed as an associate at her firm working out of the Long Island office," *id.* at 104 ¶ 10. Shortly after they submitted their pre-hearing memoranda, Outside Counsel also tendered to Demetriades and her counsel a list of exhibits they intended to introduce at the hearing, which included transcripts of the court proceeding where Demetriades stated that Pierre was her associate and the deposition where Demetriades was questioned about those statements.

24

\*　　　　　\*　　　　　\*

At bottom, Demetriades lacks any legal or factual basis for her contentions that the Committee conducted a "trial by ambush" or otherwise "violat[ed] . . . the Fifth Amendment's Due Process Clause."　Demetriades Br. at 7.　We firmly reject them.

## C. Sufficiency of the Evidence

Demetriades next argues that "the Committee failed to demonstrate that [she] violated [any of the Rules at issue in] the charges" on which she was ultimately found liable.　*Id.* at 16 (capitalization standardized).　Again, we disagree.

### 1. Demetriades's General Objection to the Committee's Use of Transcripts from Prior, Non-Disciplinary Proceedings

Across the board, Demetriades argues that it was improper for the Committee to rely on filings and transcripts of proceedings from her prior matters in the Eastern District as evidence of her misconduct.　More specifically, she invokes *Peters* for the proposition that "non-disciplinary matters cannot be used to substantiate findings of misconduct in subsequent disciplinary proceedings," Demetriades Br. at 18–19, 21–24 (citing *Peters*, 642 F.3d at 385), and thus contends that in light of the Committee's reliance on transcripts from her other Eastern

25

District cases, "there was insufficient evidence to support the charge[s]," *id.* at 22–24. This, however, misapprehends what we said in *Peters.*

At issue in *Peters* was a district-court grievance committee's "decision" to simply "*follow[]* [the] sanctions decision [of a district judge in a prior non-disciplinary matter] without holding an independent evidentiary hearing." 642 F.3d at 385 (emphasis added; citation and alterations omitted); *see also id.* at 397 (noting that "the [g]rievance [c]ommittee adopted [the] *conclusion*" of the sanctions order in the prior non-disciplinary matter, rather than merely using filings and transcripts from that matter as *evidence* in the disciplinary proceedings (emphasis added)). We held that, since "an independent evidentiary hearing would not have been duplicative of [the prior] sanctions proceeding" in that case, "the [c]ommittee was incorrect to rely on such preclusion doctrines as collateral estoppel and res judicata in finding that it need not hold its own hearing." *Id.* at 385–86. But we said nothing in *Peters* to suggest that when a grievance committee *does* "hold its own [evidentiary] hearing" – as the Committee did here – it may not consider transcripts and filings from the charged attorney's prior cases as *evidence* of her misconduct. *Id.* at 386. Indeed, our own merits analysis in *Peters* focused extensively on filings and transcripts from the charged attorney's

26

prior non-disciplinary matters as proper "evidence" of the attorney's alleged misconduct; moreover, we specifically instructed the district-court grievance committee to make "detailed factual findings" on that "evidence" in its evidentiary hearing "[o]n remand."  *Id.* at 395, 397; *see generally id.* at 393–98 (analyzing filings and transcripts from non-disciplinary proceeding).  Thus, to the extent that Demetriades's sufficiency-of-the-evidence challenge relies on her contention that it was improper for the Committee to consider filings and transcripts from her non-disciplinary matters in the Eastern District, it fails.

### 2.  Demetriades's Specific Challenges to Individual Charges

Also embedded in Demetriades's overarching sufficiency-of-the-evidence argument are more specific contentions that the Committee made legal and factual errors in adjudicating particular charges for violations of the New York Rules of Professional Conduct.   We reject each of these contentions, which we address in turn.

### a.  False Statements

With respect to the false-statements charge, Demetriades presses the legal argument that Rule 3.3(a) covers only false statements "of material fact" (i.e., statements that would "undermine[] the integrity of the adjudicative process")

27

that are made with "venal intent."   Demetriades Br. at 16–17 (first quoting N.Y. Rules of Prof. Con. 3.3(a)(1); then quoting N.Y. Rules of Prof. Con. 3.3 cmt. 2; then quoting *Peters*, 642 F.3d at 394).   She then asserts that the Committee failed to prove these putative elements of the charge by clear and convincing evidence.

As an initial matter, "venal intent" is not an element of Rule 3.3(a)'s prohibition on making false statements to a tribunal; the rule requires only that a lawyer "knowingly" make such a statement.   N.Y. Rules of Prof. Con. 3.3(a)(1). Demetriades cites our decision in *Peters* for the proposition that "'venal intent' is required to support a charge of misrepresentation [under Rule 3.3(a)]," Demetriades Br. at 17 (citing *Peters*, 642 F.3d at 394–95), but she once again misreads *Peters*.   There, we were dealing not with an attorney's false statements to a tribunal, but with "an attorney's violation of a court order," and we "stat[ed] that 'venal intent' is [an] element of [a separate provision of the now-defunct New York Code of Professional Responsibility]," *Peters*, 642 F.3d at 394 (citation omitted), which was repealed and replaced by the Rules of Professional Conduct in 2009, *see* N.Y. Code of Prof. Resp. § 1200.1 (noting repeal of Code of Professional Responsibility, effective April 1, 2009); N.Y. Rules of Prof. Con., pmbl. (noting enactment of Rules of Professional Conduct, effective April 1, 2009).

More to the point, the record makes amply clear that Demetriades *did* "knowingly" lie about Pierre's status.   N.Y. Rules of Prof. Con. 3.3(a)(1).   In a November 2016 proceeding, the transcript of which was introduced at Demetriades's evidentiary hearing without objection, Magistrate Judge Mann explicitly asked Demetriades whether Pierre was a "contract attorney[]," and Demetriades responded, "No, she is an associate attorney with my firm."   App'x at 781–82.   And Demetriades, when testifying at her evidentiary hearing in *these* proceedings, admitted that she understood that a "contract attorney" and an "associate" are "two different things," and that she "did use [the term 'associate'] deliberately."   *Id.* at 734–35.

As for materiality, Demetriades argues that "[r]eferring to Pierre as her 'associate' was not a material fact that could be used to substantiate a false[-]statement charge[;] it was an innocent statement used to refer to [Demetriades's] work companion during a fluid and developing relationship."   Reply Br. at 27.   We are not persuaded.   Magistrate Judge Mann's questions regarding Pierre's employment status were posed in the context of her expression of concerns about "whether [Demetriades] was properly staffed to handle the numerous ADA cases she had filed in the Eastern District," "whether Demetriades

29

was in compliance with requirements that she have an office in New York State,"
and "whether [Demetriades] had taken any real steps to adequately staff her office
and her cases." Committee Br. at 28–29. Those concerns were clearly "material,"
N.Y. Rules of Prof. Con. 3.3(a)(1), to "the integrity of the adjudicative process,"
N.Y. Rules of Prof. Con. 3.3 cmt. 2. In sum, we agree with the Committee that
"Demetriades clearly understood the significance of [Magistrate Judge Mann's]
questioning and chose to lie to the court." Committee Br. at 29.

### b. Lack of Competency

Regarding the lack-of-competency charge under Rule 1.1(a), Demetriades
(1) challenges the Committee's failure to "retain[] a qualified expert witness to
determine if [she] was competent in disability law," and (2) asserts that she "fully
explained the scope of her representation to her clients." Demetriades Br.
at 18–19. As to the first of these contentions, Demetriades provides no authority
for the proposition that a court must use expert testimony to conclude that an
attorney lacks competency – nor are we aware of any. Indeed, the New York
Court of Appeals has explained that the key inquiry under Rule 1.1(a) is whether
"an attorney failed to exercise the *ordinary*[,] *reasonable* skill and knowledge
*commonly* possessed by a member of the legal profession." *Darby & Darby, P.C. v.*

*VSI Int'l, Inc.*, 95 N.Y.2d 308, 313 (2000) (emphasis added; internal quotation marks omitted); *see also* N.Y. Rules of Prof. Con. 1.1 cmt. 1 (noting that typically, "the required proficiency is that of a general practitioner"). By its terms, that inquiry may be adequately performed by a court possessing "common[]" and "ordinary" knowledge of the charged attorney's practice area, without the aid of an expert who specializes in that field. *Darby & Darby*, 95 N.Y.2d at 313 (citation omitted).

As for Demetriades's contention that she "fully explained the scope of her representation to her clients," Demetriades Br. at 19, this argument misses the point. In Demetriades's standard "retainer agreement," her "client[s] waive[d] the right to pursue monetary damages," "waive[d] the right to bring any claims under New York law," "agree[d] to seek only injunctive relief," and stipulated that "any and all money . . . that's awarded to the plaintiff as a result of the lawsuit goes to [Demetriades]." App'x at 632–33. Whether or not Demetriades "fully explained" to her clients that "no claim for monetary damages [would be] sought" is not the issue. Demetriades Br. at 19. The issue is that she was not "aware" that "disabled people denied access to properties *can* recover compensatory damages" "under the New York City Human Rights Law" and "New York State Human Rights Law." App'x at 633–34 (emphasis added). *Compare, e.g., Kreisler*

31

*v. Second Ave. Diner Corp.*, No. 10-cv-7592 (RJS), 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012) ("Both the [New York State Human Rights Law] and the [New York City Human Rights Law] provide for compensatory damages for anyone aggrieved by" a business's "failure to provide [disabled customers] a reasonably accessible facility."), *aff'd,* 731 F.3d 184 (2d Cir. 2013), *cert. denied*, 572 U.S. 1115 (2014); *with* App'x at 634 (Demetriades stating, "I don't think [it]'s an accurate statement" that "New York State Law provides for compensatory damages when disabled people are denied access"), *and id.* at 635 (Demetriades stating, "I have not researched the issue in depth"). As the Committee explained, Demetriades's "demonstrated . . . ignorance of New York disability law" prevented her from "*meaningfully* advis[ing]her clients regarding the claims they waived by signing her limited[-]scope retainer agreements." Sp. App'x at 30 (emphasis added), *adopted, id.* at 52 ("[T]he Committee adopts the Report and Recommendation in its entirety.").

### c. Disregarding Court Orders

As to the charge for intentionally disregarding court orders under Rule 1.1(a), Demetriades argues that her failures to appear as ordered by various judges of the Eastern District were not intentional, but instead a product of her

being "overwhelmed by a difficult situation caused by the severe illness and intense care requirements of her dog, Malone." Demetriades Br. at 20. But this assertion is contradicted by Demetriades's own testimony at the evidentiary hearing, where she admitted that "there were times" when her failures to comply with court-ordered deadlines and attend court-ordered appearances were "notwithstanding [her] dog's illness." App'x at 724. Given that admission, it was hardly a "clearly erroneous assessment of the evidence," *Peters*, 642 F.3d at 384 (citation omitted), for the Committee to reject Demetriades's argument that her repeated "failures to comply with court orders and rules" over a period of roughly four years were wholly outside her control, Sp. App'x at 31.

### d. Neglecting Clients' Cases

Demetriades next challenges the Committee's finding that she neglected her clients' cases in violation of Rule 1.3(b), arguing that "evidence of record demonstrates that [she] quickly obtained settlements in the vast majority of her cases." Demetriades Br. at 21. But the record is, in fact, replete with evidence of Demetriades's failures to meet filing deadlines in her clients' cases, including several instances in which her neglect resulted in her clients' cases being dismissed for failure to prosecute. That alone is sufficient to establish that Demetriades

violated Rule 1.3(b), which demands simply that "[a] lawyer shall not neglect *a*

legal matter entrusted to th[at] lawyer." N.Y. Rules of Prof. Con. 1.3(b) (emphasis

added). That she might not have neglected *every* legal matter entrusted to her, or

even *many* such matters, is of no moment.

### e. Delay of Litigation

Demetriades raises a similar challenge to the Rule 3.2 charge for delay of

litigation, arguing that "in some instances" her delays could be chalked up to the

fact that "the defendant had not appeared and Ms. Demetriades did not . . . move

for default" because "defaults are not favorable in ADA cases," and that "[t]his

was a proper purpose for nominally delaying a case." Demetriades Br. at 22–23.

But as the Committee recognized, Demetriades's "clients would have been in a

better position had [she] obtained default judgments, because they would have

had the option to enforce the relief requested in the default judgment motion or to

negotiate with the defendants." Sp. App'x at 55–56. And while default

judgments may have made it more difficult to extract attorney's fees, the official

comments to Rule 3.2 make clear that "[s]eeking or realizing financial or other

benefit from otherwise improper delay in litigation is not a legitimate interest of

the client." N.Y. Rules of Prof. Con. 3.2 cmt. 1. Moreover, as the Committee

noted, "[t]o the extent" that Demetriades may have "prefer[red] not to move for default judgment at a particular time in a particular case for strategic reasons, she ha[d] the procedural option to request an extension of the motion deadline or file a status report informing the [district] [c]ourt of her proposed course of action." Sp. App'x at 37.   By eschewing this option in favor of simply refusing to comply with court-imposed deadlines to move for default judgments, Demetriades engaged in "[d]ilatory practices" apt to "bring the administration of justice into disrepute."   N.Y. Rules of Prof. Con. 3.2 cmt. 1.

### f.  Discourteous Conduct

With respect to her charge for discourteous conduct under Rule 3.3(f), Demetriades argues that her discourteous statements to various judges of the Eastern District were "justified" insofar as they were "in response to highly prejudicial and biased statements made by the court," and thus "do[] not constitute a violation of Rules 3.3(f)(2)–(3)."   Demetriades Br. at 23. Demetriades, however, cites no authority supporting the notion that her subjective belief that she was justified in yelling at the court and leveling unsubstantiated accusations of bias renders such activity permissible under Rule 3.3(f).

35

### g.  Unfairness to Opposing Counsel

In an apparent afterthought, Demetriades baldly asserts that there was "no evidence" that she engaged "intent[ionally] . . . or otherwise" in "unfair conduct to opposing counsel in violation of Rule 3.4(c)." *Id.* at 24.  Since this issue is "adverted to [only] in a perfunctory manner, unaccompanied by [any] effort at developed argumentation," it must be "deemed waived," *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (citation omitted) – or, more precisely, *forfeited*, *see United States v. Graham*, 51 F.4th 67, 79–80 (2d Cir. 2022).   In any event, Rule 3.4(c) treats "disregard[ing] a standing rule of a tribunal" as conduct that is unfair per se.  N.Y. Rules of Prof. Con. 3.4(c); *see also, e.g.*, *In re Gluck*, 114 F. Supp. 3d 57, 60 (E.D.N.Y. 2015) ("In failing to diligently comply with court-ordered deadlines and to appear at scheduled court conferences, Respondent . . . acted unfairly towards opposing parties and counsel (Rule 3.4) . . . ."); *In re Myerowitz*, 103 N.Y.S.3d 87, 89 (1st Dep't 2019) (noting that attorney had "violated New York[] Rule[] of Professional Conduct . . . 3.4(c)" by his "disregard of a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding").  And here, the record is replete with examples of Demetriades's disregard of the Eastern District's rules, deadlines, and orders.   Indeed, "[i]n approximately a dozen [of her] cases,"

Demetriades "failed to comply with *multiple* filing deadlines or [c]ourt instructions within the same case." Sp. App'x at 9 (emphasis in original).

**D. Reasonableness of Sanctions**

Finally, Demetriades argues that the "six[-]month suspension" imposed by the Committee "was excessively harsh and unwarranted" (1) insofar as "[n]one of [her] clients were harmed by her representation," and (2) in light of "the extreme stress she was undergoing" due to the fact that she had a "severely ill pet located in Florida." Demetriades Br. at 25–26.

As for the first of these contentions, Demetriades's representation *did* harm her clients. Her "ignorance of New York disability law" resulted in "her clients['] agree[ing] 'not to pursue potentially viable claims under New York state and city law,' including the ability to obtain $1,000 in compensatory damages." Sp. App'x at 63 (quoting *id.* at 52). Moreover, her neglect and "dilatory tactics . . . resulted in at least eleven 'failure-to-prosecute' dismissals" of her clients' cases. *Id.*

As for Demetriades's second contention, the Committee expressly credited the "extreme stress" caused by the illness of Demetriades's "long-time canine companion of fourteen and three-quarter (14 ¾) years, Mr. Malone" as a "mitigating factor[]." *Id.* at 68 (quoting Dist. Ct. Doc. No. 49-1 ¶ 9 (Demetriades's

sanctions-phase affidavit)). More to the point, the Committee carefully considered analogous New York cases and the factors set out in the ABA Standards for Imposing Lawyer Sanctions before imposing Demetriades's six-month suspension from practicing law in the Eastern District. That suspension is at the low end of what the ABA Standards would recommend for an attorney in Demetriades's circumstances – "a period of time equal to *or greater than* six months," *id.* at 80 (quoting ABA Standards § 2.3) (emphasis added) – and indeed more lenient than the suspensions that New York courts have imposed for attorneys found liable for arguably less-egregious misconduct, *see, e.g.*, *In re McGrath*, 63 N.Y.S.3d 56, 57–58 (2d Dep't 2017) (upholding six-month suspension for attorney found liable for neglecting cases, but neither lying to a tribunal, failing to provide competent representation, violating court orders, nor engaging in discourteous conduct before a tribunal); *see also In re Jean-Jerome*, 19 N.Y.S.3d 321, 322, 324 (2d Dep't 2015) (imposing two-year suspension for same, where attorney also engaged in conflict of interest). In these circumstances, the six-month suspension the Committee handed down to Demetriades was well "within the range of permissible decisions." *Peters*, 642 F.3d at 384 (citation omitted).

## IV.    CONCLUSION

Demetriades violated her most basic duty to the vulnerable clients who depended on her:  to provide them with diligent, competent representation. Along the way, her neglectful and discourteous conduct harmed the administration of justice itself.   The Committee's evidence establishing as much was unassailable.

For the foregoing reasons, we **AFFIRM** the orders of the Committee and **ORDER** that the docket in this appeal, and all its contents, be unsealed.